Earline HARPER and Benjamin Harrison

v.

UNITED STATES GOVERNMENT.

Civ. A. No. 74–2479.

United States District Court, E. D. Pennsylvania.

Jan. 29, 1976.

Michael M. Goss, Weinstein, Goss & Katzenstein, P. C., Philadelphia, Pa., for plaintiff.

Robert E. J. Curran, U. S. Atty., Kenneth A. Ritchie, Asst. U. S. Atty., E. D. Pa., Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

BRODERICK, District Judge.

The plaintiffs, Earline Harper and Benjamin Harrison, have brought this action against the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b).[1] The plaintiffs allege that a traffic accident which occurred on February 2, 1973 was proximately caused by the negligence of Sergeant First Class Robert A. Fox while Sergeant Fox was acting within the scope of his employment as a recruiter for the United States Army. Earline Harper contends that as a proximate result of the collision she received certain physical injuries, while Benjamin Harrison contends that as a proximate result of the collision his automobile sustained damage in the amount of $547.03. The United States has filed a counterclaim against the plaintiffs contending that the collision was proximately caused by the negligence of Earline Harper and that as a proximate result of the accident the United States Army vehicle Sergeant Fox was driving sustained damage in the amount of $332.42. This action was tried without a jury on May 21, 1975.

On the basis of the evidence presented by both sides at trial, the Court has determined that it must enter judgment for the plaintiffs and against the defendant.

On February 2, 1973, at 3:15 p. m., Earline Harper was driving a 1969 Riviera in a northerly direction on 17th Street in the City of Philadelphia. The car which Ms. Harper was driving was owned by Benjamin Harrison, a friend of Ms. Harper. Ms. Harper was driving the car with the permission of Mr. Harrison and was returning from a trip to her place of employment, the Norristown State Hospital, where she had gone to pick up her paycheck. There were two passengers in the car with Ms. Harper, her two and one-half year old daughter, Shermika Harper, and a friend, David Williams. Mr. Williams was sitting in the front passenger seat with Ms. Harper's daughter, Shermika, sitting on his lap. It was raining and while driving Ms. Harper had on her windshield wipers as well as her headlights. As Ms. Harper approached the intersection of 17th Street and Pulaski Avenue, she stopped at the southern curb of Pulaski Avenue for a red traffic signal. Seventeenth Street, in the area in question, has three lanes, two of which are used for traffic. The third is used for parking. Traffic on 17th Street is two-way, with cars traveling both north and south. As Ms. Harper faced north on 17th Street waiting for the red traffic light to turn green, she was in the far right lane or east lane of traffic. The middle lane directly to the left of Ms. Harper was for traffic traveling south on 17th Street, and the far left lane or west lane was used for parking. North of Pulaski Avenue on 17th Street the pattern of traffic shifted, with the far east lane being used for parking while the middle

---

1. 28 U.S.C. § 1346(b) reads:

    Subject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for the District of the Canal Zone, and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

lane was used by traffic going north on 17th Street and the far west lane was for traffic traveling south on 17th Street.

Ms. Harper, who was in the east lane of 17th Street, was waiting for the traffic light at the intersection of 17th and Pulaski to change and was preparing to make a left turn across traffic onto Pulaski Avenue. (N.T. 13). While waiting for the traffic light to change, Ms. Harper turned on her left turn signal and prepared to make her left turn. Ms. Harper did not move immediately when the traffic light turned green but waited for a car which was traveling south on 17th Street and which was also waiting for the traffic light at 17th and Pulaski to turn green to pass through the intersection at 17th and Pulaski. (N.T. 15, 27). When the car passed, the light being green, Ms. Harper proceeded into the intersection to make her left turn onto Pulaski Avenue (N.T. 15, 28). Ms. Harper stopped her car, however, before completing her turn in order to allow the vehicle driven by Sergeant Fox to pass. Sergeant Fox, who also had a green light, was proceeding south on 17th Street. (N.T. 15, 29). After Ms. Harper brought her car to a stop, she was about half way across the intersection of 17th Street and Pulaski Avenue angled slightly to the left. (N.T. 15, 30). Ms. Harper first observed Sergeant Fox when he reached the north curb of 17th and Pulaski. She saw that Sergeant Fox was not paying attention to where he was driving but was talking to another person seated in the front seat of his car. (N.T. 16, 32). She testified that when she saw Sergeant Fox coming directly toward her car, she sounded her horn and tried to get his attention. (N.T. 15, 32). Sergeant Fox looked up and applied his brakes in an effort to stop before skidding into Ms. Harper. (N.T. 16, 33). The left front of Sergeant Fox's car contacted the left front of Ms. Harper's vehicle. (N.T. 16, 17).

David Williams, the passenger who was in the front seat of Ms. Harper's car, testified at the trial and corroborated Ms. Harper's account of the accident. He testified that as Sergeant Fox approached the intersection of 17th and Pulaski, he was talking to a companion in the front seat of his car and was not watching where he was driving. (N.T. 55). Mr. Williams stated that Sergeant Fox then applied his brakes but slid into the Harper car. (N.T. 55, 56).

Sergeant Fox testified that there was no one in his car with him at the time of the accident. He stated that as he approached the intersection of 17th and Pulaski he saw the Harper vehicle with its left turn signal on and preparing to make a left turn. (N.T. 77, 78). Sergeant Fox testified that as he was traveling south on 17th Street at Pulaski Avenue, Ms. Harper suddenly veered into him as if she were making a left hand turn. (N.T. 79). Sergeant Fox testified that contact occurred before he had a chance to apply his brakes or turn away. (N.T. 84). The Court has accepted the version of the accident as testified to by Ms. Harper and Mr. Williams.

■ Under Pennsylvania law [2] "The driver of a vehicle . . . intending to turn left within an intersection, shall yield the right of way to any vehicle approaching from the opposite direction which is within the intersection or so close as to constitute an immediate hazard." 75 P.S. § 1013(b). Furthermore, the operator of a motor vehicle at an intersection must exercise a higher degree of care than is required in normal travel and he must have his car under such control that he is normally able to stop if there is an impediment to his travel. *Fidelity-Philadelphia Trust Co. v. Staats*, 358 Pa. 344, 57 A.2d 830 (1948). A driver approaching an intersection must exercise a high degree of care in entering that intersection notwithstanding a traffic signal and a light in his favor and if he fails to exercise such care and take such precautions as a prudent man would in regard to the speed of his vehicle or the control of his car or

2. All parties have agreed that Pennsylvania law applies to this case.

in keeping a lookout for cars approaching the intersection, he may be found to be negligent. *Kimmel v. Yellow Cab Company*, 414 Pa. 559, 201 A.2d 417 (1964); *Lieberman v. Philadelphia Transportation Company*, 410 Pa. 179, 188 A.2d 719 (1963); *Enfield v. Stout*, 400 Pa. 6, 161 A.2d 22 (1960); *Martin v. Hoffman*, 365 Pa. 364, 75 A.2d 529 (1950). A motorist at an intersection is required to be alert, observe conditions before entering therein and to continue to look as he proceeds through. *Rhode v. Kearney*, 208 Pa.Super. 8, 220 A.2d 378 (1966); *Burish v. Digon*, 416 Pa. 486, 206 A.2d 497 (1965); *Petrole v. George A. Fetter, Inc.*, 3 Cir., 411 F.2d 5 (1969). And, of course, a person driving a vehicle on a highway must always keep his vehicle under such control that he can stop within the assured clear distance. 75 P.S. § 1002(a); *Burchard v. Seber*, 417 Pa. 431, 207 A.2d 896 (1965); *Enfield v. Stout*, 400 Pa. 6, 161 A.2d 22 (1960).

■ We find that under the facts of this case Ms. Harper did yield the right of way to Sergeant Fox, who was traveling south on 17th Street. When Ms. Harper stopped her car there was sufficient room for Sergeant Fox to continue south on 17th Street. Therefore, we find that Ms. Harper was not negligent but used due care in entering the intersection and took all the precautions required of a prudent person when preparing to turn left. The Court finds however that Sergeant Fox did not proceed through the intersection at 17th and Pulaski in a careful and prudent manner and did not exercise the degree of care required of a motorist in the intersection. The negligence of Sergeant Fox was the proximate cause of the injury to Ms. Harper and the property damage to Mr. Harrison's car.

*Damages.*

Immediately after the accident on February 2, 1973, Ms. Harper went to Einstein Hospital for treatment. (N.T. 19). She spent the first few days of her seven day hospital stay in traction. During her hospital stay, Ms. Harper experienced numbness on her left side and pain in her neck and shoulder. (N.T. 19). After her discharge from the hospital, a cervical collar was prescribed which she wore for a period of three months. (N.T. 19). After her pain subsided, Ms. Harper returned to work on April 13, 1973, but continued to wear the collar. (N.T. 20). During her period of recovery, Ms. Harper made periodic visits to her treating physician, Dr. Katz, who prescribed exercises and medication for her pain. (N.T. 21, 45). Ms. Harper testified that although the medication relieved some of her pain, it made her drowsy and sleepy. (N.T. 21). She stated that she continued to have pain in her neck through June of 1973. (N.T. 22, 45).

■ Ms. Harper incurred hospital and doctor bills and suffered a loss of wages during the approximately ten weeks she was physically unable to work following the accident. The parties have stipulated to these amounts as follows: (1) Einstein Hospital bills—$625.85; (2) doctor bill from Dr. M. Richard Katz—$156.00; and (3) lost wages from Ms. Harper's employment at the Norristown State Hospital—$1,320.00. The total of the stipulated out of pocket expenses is therefore $2,101.85. The parties have also stipulated that damage to Mr. Harrison's 1969 Buick was in the amount of $547.03.

The remaining item of damages which the Court must determine is the element of pain and suffering. The evidence showed that as a result of the accident the plaintiff, Ms. Harper, was taken to Einstein Hospital in Philadelphia. She complained of great pain in her neck and left arm and was unable to move her head. The initial diagnosis was that Ms. Harper had sustained a fracture at the base of the odontoid process of the second cervical vertebra. However, this diagnosis was not confirmed and the injury sustained by Ms. Harper was diagnosed as a cervical sprain. Ms. Harper spent the first several days of her hospi-

tal stay in traction and had a numbness on her left side with continuing pain in her neck and shoulder. (N.T. 19). Thereafter, Ms. Harper was placed in a cervical collar while she remained in the hospital. (N.T. 19). Ms. Harper was discharged from Einstein Hospital on February 9, 1973, seven days after the accident. She was discharged wearing the cervical collar and was given medication for her continuing complaints of pain.[3] Ms. Harper wore her cervical collar for three months following her discharge from Einstein Hospital. (N.T. 42). Ms. Harper continued to wear her collar after she returned to work in mid-April, 1973. After her discharge from Einstein Hospital on February 9, 1973, Ms. Harper visited Dr. Katz periodically for treatment for the pain she continued to experience in her neck and shoulder. Dr. Katz prescribed certain exercises for Ms. Harper to strengthen her neck. He also prescribed medicine for the pain Ms. Harper was experiencing. This medication helped ease the pain that Ms. Harper was experiencing, but had an adverse side effect in that the medication made her sleepy and drowsy. (N.T. 21). There is no permanent disability resulting from the injury she received and the pain has subsided.

Considering all the evidence in this case, the Court has determined that an award of $4,000.00 will adequately compensate Ms. Harper for the pain she suffered as a proximate cause of the accident.

This Memorandum and Order is in lieu of findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

---

3. The hospital discharge note shows that Ms. Harper was given valium and aspirin as medication for her pain.